J. Stephen Simms (JS-8990)
Simms Showers LLP
201 International Circle
Baltimore, Maryland 21030
443-290-8704
jssimms@simmsshowers.com

Attorneys for Plaintiff
Minerva Bunkering Pte Ltd.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MINERVA BUNKERING PTE LTD., | Case No. _____ |
| Plaintiff, | |
| -v.- | **COMPLAINT** |
| ASHFAQUE J. RAHMAN and MAHWEEN RAHMAN, | **ADMIRALTY AND MARITIME CLAIM FED. R. CIV. P. 9(h)** |
| Defendants. | |
| _____/ | |

Plaintiff Minerva Bunkering Pte Ltd. ("Minerva") brings this action against Defendants

Ashfaque J. Rahman ("A.J. Rahman") and Mahween Rahman (together, the "Rahmans") to hold

them jointly and severally liable for the maritime obligations and judgment debt of Norvic

Shipping Asia Pte Ltd., and Norvic Maritime Holdings Inc. (collectively, "Norvic"). Minerva

alleges, upon personal knowledge as to its own acts and upon information and belief as to all

other matters, as follows:

## <u>NATURE OF THE ACTION</u>

1. This action arises from Norvic's purchase of marine fuel oil for the M/V

ALEXANDRIS, Norvic's failure to pay the agreed price, and a final English money judgment

enforcing Norvic Maritime Holdings Inc.'s unconditional payment guarantee.

- 1 -

2.     Minerva delivered 498.528 metric tons of very-low-sulfur fuel oil ("VLSFO") at Singapore pursuant to a long-term marine-fuel supply contract and a transaction confirmation. Norvic accepted the bunkers, was invoiced USD 230,040.26, repeatedly promised payment, and did not pay.

3.     Norvic Maritime Holdings Inc. had guaranteed, as primary obligor and on first demand, the present and future payment obligations of Norvic Shipping International and its subsidiaries, including Norvic Shipping Asia. When the guarantee was not honored, Minerva obtained a final judgment in the High Court of Justice of England and Wales for the principal amount, interest, and costs.

4.     The Rahmans operated Norvic as a closely held family enterprise and used Norvic's nominally separate entities as instrumentalities of their personal and family business. A.J. Rahman publicly described himself as Norvic's founder, Chairman, and Group Chief Executive Officer. Corporate records identify him as a manager or director of multiple Norvic entities. Public business records also connect Mahween Rahman to Norvic and to family-controlled businesses sharing personnel and New York addresses with the Norvic enterprise.

5.     By late 2025 and early 2026, Norvic was unable to honor multiple admitted or adjudicated maritime obligations. Publicly reported proceedings reflect claims by multiple maritime creditors, defaults, requests for maritime attachment, and Norvic's own representations in court that it was suffering severe financial difficulties, cash-flow problems, delayed inward remittances, and an inability to honor commitments.

6.     During the same period, Norvic continued to trade, incur new maritime obligations, accept goods and services on credit, promise payment, and preserve the appearance

of an ongoing global shipping business, even though the Rahmans knew or recklessly disregarded that Norvic could not pay debts as they matured.

7.      In February 2026, while Norvic's maritime creditors remained unpaid, United Overseas Trading announced that it had acquired three Norvic operating entities, Norvic's commercial dry-bulk platform, three recently built vessels, rights relating to six Japanese newbuildings, and portions of Norvic's operating team and global business organization.

8.      On information and belief, the Rahmans caused Norvic funds, business opportunities, receivables, goodwill, personnel, vessel interests, shipbuilding-contract rights, and other assets to be commingled, diverted, transferred, sold, or deployed for the benefit of themselves, their family, related entities, or successor businesses, while leaving the contracting and creditor-exposed Norvic entities inadequately capitalized and unable to pay creditors such as Minerva.

9.      The Rahmans' domination of Norvic, and their use of that domination to continue trading while insolvent, prefer insiders, transfer or preserve enterprise value, shift value to related persons or successor businesses, and frustrate enforcement of lawful maritime debts, constitutes the fraud or wrong necessary to disregard Norvic's corporate forms.

10.     Minerva therefore seeks recognition and enforcement of the English Judgment, a declaration that Norvic was the Rahmans' alter ego, and a judgment holding the Rahmans jointly and severally liable for all amounts owed by Norvic to Minerva, including post-judgment interest, costs, and attorneys' fees to the extent recoverable.

## JURISDICTION AND VENUE

11.     This Court has original admiralty and maritime jurisdiction under 28 U.S.C. § 1333 because the underlying transaction is a maritime contract for the supply of necessaries to a

vessel and the alter-ego claim seeks to enforce maritime obligations. Minerva designates this action as an admiralty and maritime claim under Federal Rule of Civil Procedure 9(h).

12.    This Court also has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2). Minerva is a citizen or subject of Singapore; on information and belief, each Defendant is a citizen of New York; and the amount in controversy exceeds USD 75,000, exclusive of interest and costs.

13.    This Court may recognize the English money judgment under New York's Uniform Foreign Country Money-Judgments Recognition Act, N.Y. C.P.L.R. Article 53, as applicable through Federal Rule of Civil Procedure 69 and principles of federal diversity jurisdiction.

14.    This Court has personal jurisdiction over Defendants because they reside in New York, conduct and direct business from New York, and committed substantial parts of the conduct alleged herein in this District. Public records identify a current or recent residence for both Defendants at 11 Beach Street, Apartment 6A, New York, New York 10013.

15.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2), and under admiralty venue principles, because Defendants reside in this District and a substantial part of the conduct giving rise to the claims occurred here.

## THE PARTIES

16.    Plaintiff Minerva Bunkering Pte Ltd. is a company incorporated under the laws of Singapore and is engaged in the worldwide sale and supply of marine fuel and related products.

17.    Defendant Ashfaque J. Rahman is an individual residing in New York County. He is also known as Ashfaque Jamil Rahman and A.J. Rahman.

18.    A.J. Rahman founded Norvic in or about 2006 and held himself out as its Chairman and Group Chief Executive Officer. Corporate records identify him as a manager of Norvic Shipping International LLC and as a director of Norvic Shipping USA Inc.

19.    Defendant Mahween Rahman is an individual residing in New York County and is A.J. Rahman's spouse.

20.    Publicly available business-network information identifies Mahween Rahman as associated with Norvic Shipping. Corporate records also identify her, together with A.J. Rahman and other family members, as a manager of RDG Florida LLC, a family-controlled entity using the same New York business address that Norvic used at 250 West 55th Street.

21.    On information and belief, Mahween Rahman participated in and benefited from the ownership, control, management, financing, asset holding, and disposition of the Norvic enterprise and related family-controlled entities. The precise details of her ownership interests, authority, access to accounts, and receipt of transfers are peculiarly within Defendants' knowledge and will be established through discovery.

## THE NORVIC ENTERPRISE

22.    Norvic Shipping International LLC is a Delaware limited liability company that maintained its principal New York office at 250 West 55th Street, Suite 2503, New York, New York 10019.

23.    Norvic Shipping Asia Pte Ltd. is a Singapore company that conducted Norvic's Asian chartering and shipping business and entered the marine-fuel transaction at issue.

24.    Norvic Maritime Holdings Inc. is an Ontario corporation that functioned as a holding and guarantee company for Norvic's operating subsidiaries.

25.    Norvic and its related entities operated as a single integrated shipping group under common branding, common senior management, common personnel, common offices, common communications, and centralized financial control.

26.    Norvic Shipping International LLC's public corporate status was reported as forfeited or inactive by February 2025, yet Norvic continued to hold itself out and operate through affiliated entities, including Norvic Shipping Asia, and continued to incur maritime debts.

27.    Norvic Shipping USA Inc. became inactive or terminated in New York and Texas in April 2026. Those terminations occurred amid numerous creditor claims and after the Norvic enterprise had incurred substantial unpaid maritime obligations.

28.    A new New York maritime business, Hellenic Dry Bulk Ventures LLC, was reported as having commenced in 2025 at 99 Hudson Street, New York, with A.J. Rahman as Chairman and a Rahman family member as Chief Executive Officer. On information and belief, Hellenic Dry Bulk Ventures or related entities received or exploited Norvic personnel, relationships, opportunities, goodwill, or other value without fair consideration while Norvic creditors remained unpaid.

29.    The temporal overlap between Norvic's financial collapse and the formation or expansion of related family-controlled maritime businesses supports the inference that Defendants migrated value away from Norvic's creditor-exposed entities while continuing the underlying shipping business through other vehicles.

**THE 2026 SALE OF NORVIC OPERATING ASSETS AND BUSINESS**

30.     On or about February 4, 2026, United Overseas Trading ("UOT"), a wholly owned subsidiary of United Overseas Group, publicly announced that it had acquired certain entities and assets from the Norvic Shipping platform.

31.     The announced transaction included UOT's acquisition of the entire issued share capital of Norvic Shipping Europe ApS, Norvic Shipping Middle East DMCC, and Norvic Shipping Ventures Pte. Ltd.

32.     The announced transaction further included a fleet of modern Japanese-built Ultramax and Handysize dry-bulk vessels, including the 2023-built Norvic Copenhagen, Norvic Houston, and Norvic Singapore, which were to be renamed UOT Copenhagen, UOT Houston, and UOT Singapore.

33.     The transaction also included rights relating to six Japanese newbuildings scheduled for delivery in 2026 and 2027, identified as UOT New York, UOT London, UOT Paris, UOT Athens, UOT Tokyo, and UOT Dubai.

34.     As part of the transaction, certain Norvic employees joined UOT, including Norvic's Chief Commercial Officer, Michael Boetius, who was announced as head of the acquired platform. The acquired entities were to operate under the UOT brand, with an operational presence in Athens, Copenhagen, Singapore, Dubai, Brazil, and Japan.

35.     The transfer of operating subsidiaries, vessels, newbuilding rights, personnel, commercial organization, customer relationships, goodwill, and global operations constituted a disposition of substantial going-concern and enterprise value, rather than an isolated sale of individual assets.

36.     The public announcement did not identify Norvic Shipping International LLC, Norvic Shipping Asia Pte Ltd., or Norvic Maritime Holdings Inc. as acquired entities, even though those entities remained liable to Minerva and other maritime creditors.

37.     On information and belief, Defendants caused or approved the transaction while Norvic was insolvent, inadequately capitalized, unable to pay debts as they matured, or facing substantial creditor claims, and while Minerva's debt remained unpaid.

38.     On information and belief, Defendants caused valuable operating assets, contractual rights, vessel interests, personnel, business opportunities, receivables, and goodwill to be transferred, sold, assigned, or otherwise placed beyond the reach of Norvic's creditor-exposed entities without ensuring that the resulting consideration was retained and applied to legitimate creditor claims.

39.     The amount and form of consideration paid in connection with the transaction, the identities of the recipients, the allocation of proceeds among Norvic entities, and any distributions, repayments, bonuses, dividends, management fees, insider-loan repayments, or related-party transfers made from the proceeds are peculiarly within Defendants' possession and control and will be established through discovery.

40.     On information and belief, some or all of the proceeds or other benefits of the transaction were transferred, distributed, encumbered, or otherwise deployed for the benefit of Defendants, family members, affiliates, insiders, or selected creditors, while Minerva and other maritime creditors remained unpaid.

41.     The transaction preserved and transferred the operating value of the Norvic enterprise while leaving Norvic Shipping International LLC, Norvic Shipping Asia Pte Ltd., and

Norvic Maritime Holdings Inc. with insufficient unencumbered assets to satisfy Minerva's maritime debt and the English Judgment.

## THE MARITIME FUEL TRANSACTION

42.    On or about June 20, 2025, Minerva and Norvic Shipping Asia Pte Ltd. entered Long Term Supply Contract No. 9017897 for the supply of VLSFO, incorporating the Minerva Bunkering Terms 2025.

43.    The Minerva Bunkering Terms provide, among other things, for payment of the purchase price, contractual interest on overdue amounts, and recovery of attorneys' fees and costs incurred in pursuing nonpayment.

44.    On or about October 14, 2025, Minerva and Norvic Shipping Asia Pte Ltd. agreed that Minerva would supply between 450 and 600 metric tons of VLSFO to the Norvic-chartered M/V ALEXANDRIS at Singapore.

45.    Minerva duly delivered 498.528 metric tons of VLSFO, as evidenced by Bunker Delivery Note No. 2511-0AMWGLJJ.

46.    Minerva issued Invoice No. 5597-74611 in the amount of USD 230,040.26.

47.    Norvic accepted the bunkers without timely objection and repeatedly acknowledged and promised to pay the debt.

48.    Norvic failed and refused to pay.

## THE GUARANTEE AND ENGLISH JUDGMENT

49.    On February 23, 2022, Norvic Maritime Holdings Inc. issued a written payment guarantee in favor of Minerva.

50.     Under the guarantee, Norvic Maritime Holdings Inc. undertook, as primary obligor and on first demand, to guarantee present and future payment obligations of Norvic Shipping International Ltd. and its subsidiaries, including Norvic Shipping Asia Pte Ltd.

51.     Minerva demanded payment under the guarantee. Norvic Maritime Holdings Inc. did not pay.

52.     Minerva commenced proceedings in the High Court of Justice of England and Wales to enforce the guarantee.

53.     By order dated April 1, 2026 and sealed April 9, 2026, the English court entered judgment requiring Norvic Maritime Holdings Inc. to pay USD 230,040.26, together with interest and costs (the "English Judgment").

54.     The English Judgment was validly served through the contractual process agent and is final, conclusive, and enforceable where rendered. No application to vacate or set aside the English Judgment was reported as of Minerva's June 25, 2026 demand.

55.     As of June 25, 2026, the judgment debt totaled at least USD 288,133.58, consisting of USD 230,040.26 principal, accrued interest, and recoverable costs. Interest and enforcement costs have continued to accrue thereafter.

56.     Despite demand, neither Norvic nor the Rahmans have caused the English Judgment to be satisfied.

### NORVIC'S INSOLVENCY AND MULTIPLE CREDITOR CLAIMS

57.     By no later than late 2025, Norvic was insolvent on a cash-flow basis, inadequately capitalized, or in the zone of insolvency, because it could not pay multiple maritime debts as they became due.

58.     In 2023, Norvic Shipping International Ltd., a Bermuda company, and certain non-Bermuda Norvic subsidiaries entered into a US$42.5 million revolving credit facility with Valley National Bank acting as agent.  By information and belief, A.J. Rahman signed the documentation of this credit facility for Norvic, further indebting Norvic.  Further by information and belief, with Norvic's insolvency Norvic became in default of the credit facility, with Valley National Bank taking control of significant Norvic assets and Norvic, by the Rahmans, also required by personal obligations to Valley National Bank to liquidate Norvic assets in order to pay Valley National Bank.

59.     In proceedings decided by the High Court of Bombay in July 2026, Norvic Shipping Asia Pte Ltd. represented that it was experiencing severe financial difficulties, affected cash flow, delayed customer payments and inward remittances, and an inability to honor commitments.  The court also noted the existence of several other creditors and ordered security and asset disclosure.  On July 2, 2026, the Bombay High Court (*Norvic Shipping Asia Pte Ltd v. Zigma International*) granted interim relief against Norvic after finding a significant risk of diminution of assets. It ordered Norvic to disclose all bank accounts, all assets, all secured lenders, all assets transferred during the previous two years; and all pending insolvency, bankruptcy and winding-up proceedings, that Norvic post security of over $270,000 and that Norvic not dispose of assets.

60.     General Steamship Corporation filed an admiralty action against Norvic Shipping International LLC and a Canadian Norvic affiliate in the District of New Jersey in February 2026, asserting unpaid maritime agency invoices.

61.     Atlantis Blue Shipping Company filed an admiralty action against Norvic Shipping International LLC and Norvic Shipping Asia in the District of New Jersey in May 2026 and sought maritime attachment.

62.     Further, on April 8, 2026, MUR Shipping BV initiated a winding up proceeding against Norvic Shipping Asia Pte. Ltd. (Case No. HC/CWU 88/2026) in the General Division of the High Court of Singapore under the Singapore Insolvency, Restructuring and Dissolution Act, claiming unpaid debt of over $270,000.

63.     These proceedings are not pleaded as adjudications of liability against Defendants. They are pleaded as facts showing the number and timing of creditor claims, Norvic's inability to meet obligations, and Defendants' knowledge that Norvic was financially distressed while continuing to trade and disposing of substantial enterprise assets.

### **ALTER-EGO FACTS AND FRAUD OR WRONG**

64.     At all relevant times, A.J. Rahman exercised complete domination over Norvic's ownership, strategy, credit decisions, treasury, intercompany transfers, asset dispositions, and responses to creditors.

65.     On information and belief, Mahween Rahman shared in the control and economic benefits of the Norvic enterprise, held or controlled assets for the family, participated in related entities, and assisted in transfers or arrangements that placed value beyond Norvic creditors' reach.

66.     Norvic's entities disregarded corporate separateness by using overlapping officers, directors, managers, personnel, addresses, telephones, email domains, branding, vendors, customers, and business infrastructure.

67.    The entities did not operate as genuinely independent profit centers. Credit, cash, receivables, guarantees, liabilities, vessels, chartering opportunities, and other business assets were allocated or shifted among them according to Defendants' interests rather than arm's-length standards.

68.    Norvic Maritime Holdings Inc. guaranteed operating-company debts, demonstrating centralized group credit and the absence of meaningful separation between the holding company and operating subsidiaries.

69.    Norvic's contracting entities were inadequately capitalized for the scale and risks of the shipping business they conducted and depended on discretionary funding controlled by Defendants or related entities.

70.    On information and belief, corporate funds were commingled with funds of affiliates or family-controlled entities; intercompany transfers were undocumented or not made on arm's-length terms; and corporate assets were used for personal or family purposes.

71.    Defendants caused Norvic to incur the Minerva obligation and other maritime debts when they knew or recklessly disregarded that Norvic lacked sufficient unencumbered assets and cash flow to pay those debts in the ordinary course.

72.    Defendants caused Norvic to make payment promises that delayed enforcement and enabled continued trading, while Defendants concealed Norvic's true financial condition and the movement, sale, transfer, or encumbrance of assets.

73.    Rather than preserve Norvic's assets for legitimate creditors, Defendants caused or approved the disposition of operating subsidiaries, vessel interests, shipbuilding-contract rights, personnel, commercial operations, customer relationships, goodwill, and other going-concern value during a period of insolvency or acute financial distress.

74.     Defendants thereby preserved or transferred the operating value of the enterprise while leaving creditor-exposed Norvic entities unable to satisfy Minerva's debt and the English Judgment.

75.     The timing, structure, and selectivity of the 2026 transaction, together with the omission of the principal debtor and guarantor entities from the announced acquisition, support the inference that Defendants used their control to hinder, delay, or frustrate creditors and to strand liabilities in entities deprived of operating value.

76.     Defendants used their domination to prefer insiders or selected creditors, preserve assets and opportunities for themselves and related entities, terminate or abandon creditor-exposed entities, and continue or permit substantially the same shipping business to continue through successor or family-controlled entities.

77.     Defendants failed to observe corporate formalities and failed to maintain adequate records distinguishing the ownership and use of assets, liabilities, receivables, sale proceeds, and business opportunities among Norvic entities and related family businesses.

78.     Defendants' conduct was not merely poor business judgment. It involved continuing to incur credit when Norvic could not pay debts as they matured, concealing financial distress, delaying enforcement through payment promises, and disposing of substantial enterprise value while creditors remained unpaid.

79.     Defendants' conduct left Norvic unable to satisfy Minerva's maritime debt and the English Judgment, while Defendants and related persons retained or directed the benefits of the marine fuel, the sale proceeds, and the continuing shipping enterprise.

80.     Respecting Norvic's nominal separateness under these circumstances would sanction fraud or injustice and permit Defendants to use the corporate form to externalize

business losses onto maritime creditors while retaining, transferring, or directing the enterprise's value.

**COUNT I**
**ALTER-EGO / PIERCING-THE-CORPORATE-VEIL LIABILITY**
**<u>(Federal Maritime Common Law)</u>**

81.   Minerva repeats and realleges paragraphs 1 through 80 as if fully set forth herein.

82.   Federal maritime common law permits the corporate form to be disregarded where an owner or controller uses a corporation to perpetrate fraud or so dominates and disregards the entity's form that the entity primarily transacts the controller's business rather than its own.

83.   The factors relevant to alter-ego status include disregard of formalities, inadequate capitalization, intermingling of funds and property, overlap in ownership and management, common offices and communications, lack of business discretion, non-arm's-length dealings, failure to treat entities as independent profit centers, and payment or guarantee of debts across the group.

84.   As alleged above, the Rahmans completely dominated Norvic and disregarded its separate forms.

85.   The Rahmans used that domination to commit fraud or wrong against Minerva, including causing Norvic to trade and incur credit while insolvent, concealing its inability to pay, making promises to delay enforcement, transferring substantial operating and vessel-related value, shifting or preserving value for insiders and related entities, and rendering Norvic unable to satisfy Minerva's debt and judgment.

86.   Norvic therefore was the alter ego and instrumentality of each Defendant with respect to the transactions and injuries alleged.

- 15 -

87.    The Rahmans are jointly and severally liable for all amounts Norvic owes

Minerva, including the English Judgment, contractual interest, post-judgment interest, attorneys'

fees, and enforcement costs to the extent permitted by law.

## COUNT II
## RECOGNITION AND ENFORCEMENT OF FOREIGN-COUNTRY MONEY
## JUDGMENT (N.Y. C.P.L.R. Article 53)

88.    Minerva repeats and realleges paragraphs 1 through 87 as if fully set forth herein.

89.    The English Judgment grants recovery of a sum of money, is final, conclusive,

and enforceable where rendered, and was issued by an impartial tribunal under procedures

compatible with due process.

90.    The English court had jurisdiction under the written guarantee and its process-

agent and forum provisions, and Norvic Maritime Holdings Inc. received legally sufficient notice

and an opportunity to be heard.

91.    No mandatory or discretionary ground for nonrecognition under N.Y. C.P.L.R.

Article 53 applies.

92.    Because Norvic Maritime Holdings Inc. was Defendants' alter ego and

instrumentality, the English Judgment is enforceable against Defendants to the same extent as

against Norvic Maritime Holdings Inc.

93.    Minerva is entitled to recognition of the English Judgment and entry of a New

York judgment against Defendants, jointly and severally, for the unpaid judgment balance plus

all interest and recoverable costs.

## COUNT III
## DECLARATORY JUDGMENT
## (28 U.S.C. §§ 2201-2202)

94.    Minerva repeats and realleges paragraphs 1 through 93 as if fully set out herein.

95.    An actual and justiciable controversy exists concerning whether Norvic is the Rahmans' alter ego and whether the Rahmans are personally liable for Norvic's obligations to Minerva.

96.    A declaration of the parties' rights will resolve that controversy and facilitate enforcement against assets held or controlled by Defendants.

97.    Minerva is entitled to a declaration that Norvic was and is the alter ego of the Rahmans and that the Rahmans are jointly and severally liable for all amounts owed by Norvic to Minerva.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A.    Recognize the English Judgment and enter judgment against Defendants, jointly and severally, in the amount of the unpaid judgment debt, which was at least USD 288,133.58 as of June 25, 2026, together with all additional accrued interest and recoverable costs;

B.    Declare that Norvic Shipping International LLC, Norvic Shipping Asia Pte Ltd., and Norvic Maritime Holdings Inc. were and are the alter egos and instrumentalities of Defendants;

C.    Enter judgment holding Defendants jointly and severally liable for all amounts otherwise owed by Norvic to Minerva arising from the M/V ALEXANDRIS bunker transaction, the payment guarantee, and the English Judgment;

D.    Award pre-judgment and post-judgment interest at the contractual or statutory rates, as applicable;

E.      Award Minerva its attorneys' fees and costs to the extent provided by contract, maritime law, judgment, statute, or the Court's equitable powers;

F.      Permit discovery concerning all transfers of vessels, vessel-owning interests, shipbuilding contracts, shares, sale proceeds, intercompany transfers, dividends, shareholder or insider loans, management fees, bonuses, and distributions made by any Norvic entity or either Defendant from January 1, 2025 to the present, and permit post-judgment discovery and execution against assets beneficially owned, held, transferred, or controlled by Defendants or their alter egos; and

G.      Grant such other and further relief as the Court deems just and proper.

Dated:  August 9, 2026

/s/ J. Stephen Simms
J. Stephen Simms (JS-8990)
Simms Showers LLP
201 International Circle
Baltimore, Maryland 21030
443-290-8704
jssimms@simmsshowers.com

Attorneys for Plaintiff
Minerva Bunkering Pte Ltd